## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
|  | : | Case No. 18-10601 (MFW) |
| The Weinstein Company | : |  |
| Holdings LLC, *et al.*, | : | (Jointly Administered) |
|  | : |  |
| Debtors. | : |  |

---------------------------------------------------- x

|  |  |  |
|---|---|---|
| Y Movie, LLC, Y Theatrical, LLC, | : |  |
| YFE Holdings, Inc., OA3, LLC, | : |  |
| and RMF, LLC, | : |  |
|  | : |  |
| Appellants, | : |  |
|  | : |  |
| v. | : |  |
|  | : | Civil Action No. 19-675 (MN) |
| Spyglass Media Group, LLC | : |  |
| (f/k/a Lantern Entertainment LLC) | : |  |
|  | : |  |
| Appellee. | : |  |
|  | : |  |

---------------------------------------------------- x

## APPELLEE'S ANSWERING BRIEF

R. Craig Martin (DE No. 5032)
Maris J. Kandestin (DE No. 5294)
DLA PIPER LLP (US)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: craig.martin@dlapiper.com
        maris.kandestin@dlapiper.com

Thomas R. Califano (*admission pro hac vice pending*)
Rachel Ehrlich Albanese (*admission pro hac vice pending*)
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Email: thomas.califano@dlapiper.com
        rachel.albanese@dlapiper.com

Dated: July 15, 2019

*Counsel to Appellee Spyglass Media Group, LLC (f/k/a Lantern Entertainment LLC)*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 7.1(a) of the Federal Rules of Civil Procedure, Rule 8012 of the Federal Rules of Bankruptcy Procedure, and Rule 26.1 of the Federal Rules of Appellate Procedure, Spyglass Media Group, LLC makes the following disclosure:

LE MIP, LLC owns 12% of Spyglass Media Group, LLC and Lantern Entertainment Intermediate Holdco LLC owns 88%.  No publicly held corporation owns 10% or more of the equity in Spyglass.

# TABLE OF CONTENTS

Page

I.     INTRODUCTION AND SUMMARY OF ARGUMENT...............................1

II.    STATEMENT OF THE BASIS OF APPELLATE JURISDICTION ............2

III.   COUNTER-STATEMENT OF ISSUES AND STANDARD OF REVIEW...............................................................................................3

IV.   STATEMENT OF THE CASE .............................................................4

    A.    Bankruptcy Filing and Sale to Spyglass................................4

    B.    The APA, as Amended, and the Contract Notices ...............5

    C.    The Talent Party Litigation .................................................8

    D.    The Investment Agreements................................................11

    E.    The Yucaipa Litigation.......................................................15

V.    ARGUMENT......................................................................................17

    A.    The Bankruptcy Court correctly concluded Spyglass did not purchase the Investment Agreements under the APA. .......................17

        1.    The Investment Agreements are not executory, cannot be assumed under section 365(a) of the Bankruptcy Code as a matter of law, and were not purchased under the APA. ........17

        2.    Even if the Investment Agreements were executory, which they are not, they are not capable of assumption and assignment under section 365(c)(2) of the Bankruptcy Code. ......................................................................................22

        3.    The Investment Agreements are not Title Rights. ....................26

    B.    The Obligations Under the Investment Agreements are "Excluded Liabilities" under the APA, which Spyglass did not assume. ..........................................................................................27

        1.    The Investment Agreements are "Excluded Liabilities" under the APA because they contain liabilities arising under a contract that is not an Assumed Contract. .................27

        2.    The Investment Agreements are "Excluded Liabilities" under the APA because they are debt instruments. .................29

i

3.      The Investment Agreements are not Assumed Liabilities, as they were not listed on Schedule 2.3 of the APA.................30

C.      The Talent Party Agreements are distinguishable from the Investment Agreements, because the Talent Party Agreements have value, whereas the Investment Agreements are Liabilities. .......32

VI.     CONCLUSION.............................................................................................33

EAST\168009251.1

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Best Prod. Co., Inc.*,
   210 B.R. 714 (Bankr. E.D. Va. 1997)..........................................................................23, 24

*In re Exide Techs.*,
   378 B.R. 762 (Bankr. D. Del. 2007)............................................................................19, 28

*In re Fitch*,
   174 B.R. 96 (Bankr. S.D. Ill. 1994)...................................................................................28

*Heasley v. Belden & Blake Corp.*,
   2 F.3d 1249 (3d Cir. 1993) ..................................................................................................3

*Manus Corp. v. NRG Energy, Inc.* (*In re O'Brien Envt'l Energy, Inc.*),
   188 F.3d 116 (3d Cir. 1999) ................................................................................................3

*Mirkowicz v. Reading Co.*,
   84 F.2d 537 (3d Cir. 1936) ................................................................................................26

*Nat'l Bank v. Thomas B. Hamilton Co.* (*In re Thomas B. Hamilton Co.*),
   969 F.2d 1013 (11th Cir. 1992) ....................................................................................23, 24

*Newark Morning Ledger Co. v. U.S.*,
   539 F.2d 929 (3d Cir. 1976) ..............................................................................................26

*Sanchanko v. Gill*,
   388 F.2d 859 (3d Cir. 1968) ..............................................................................................26

*Skold v. Galderma Labs. L.P.*,
   917 F.3d 186 (3d Cir. 2019) ................................................................................................4

*In re Sportsman's Warehouse, Inc.*,
   457 B.R. 372 (Bankr. D. Del. 2011)............................................................................22, 24

*In re United Airlines, Inc.*,
   368 F.3d 720 (7th Cir. 2004) .............................................................................................24

*Viera v. Life Ins. Co. of North America*,
   642 F.3d 407 (3d Cir. 2011) ................................................................................................3

iii

*In re Waste Sys. Int'l, Inc.*,
   280 B.R. 824 (Bankr. D. Del. 2002) ............................................................9, 19

*Watts v. Pa. Housing Fin. Co.* (*In re Watts*),
   876 F.2d 1090 (3d Cir. 1989) ............................................................................22

**Statutes**

11 U.S.C. § 363 ............................................................................4, 7, 9, 10

11 U.S.C. § 363(f) ........................................................................................23

11 U.S.C § 365 ...................................................................................*passim*

11 U.S.C. § 365(a) ..................................................................................17, 19

11 U.S.C. § 365(c)(2) ..................................................................22, 23, 25, 26

28 U.S.C. § 158(a)(1) .....................................................................................3

**Other Authorities**

124 Cong. Rec. H11089 (daily ed. Sep. 28, 1978) (statement of Rep.
   Edwards) .........................................................................................................24

*Black's Law Dictionary* 404 (10th ed. 2014) ......................................22, 23

EAST\168009251.1

# I.    INTRODUCTION AND SUMMARY OF ARGUMENT[1]

Prior to filing their bankruptcy cases, the Debtors received financing from the Appellant "Financiers," Y Movie, LLC, Y Theatrical, LLC, YFE Holdings, Inc., OA3, LLC, and RMF, LLC (collectively, "Yucaipa"), through "Investment Agreements," under which Yucaipa loaned money to the Debtors in exchange for, among other things, a security interest in the Debtors' rights in certain films. The Debtors agreed to repay these "financings" through revenues generated by the films based on a "waterfall" in the governing documents. Not content with a claim against the Debtors' estates like other similarly-situated creditors, Yucaipa argues that Appellee Spyglass Media Group, LLC (f/k/a Lantern Entertainment LLC) ("Spyglass"), as purchaser of the Debtors' assets, impliedly ***chose*** to assume these liabilities under the Investment Agreements—an illogical and counter-intuitive position that relies on an unreasonable and tortured reading of the APA.

This appeal should be denied based on the clear and unambiguous provisions of the APA and the Bankruptcy Code. As the Bankruptcy Court correctly held, Yucaipa's "Investment Agreements" are "non-executory" contracts that are ***not capable*** of being assumed under bankruptcy law. And as the Bankruptcy Court also correctly held, the Investment Agreements are "Excluded Liabilities" under the APA

---

[1]    Capitalized terms not defined in this *Introduction and Summary of Argument* and the below *Counter-Statement of Issues and Standard of Review* shall have the meaning ascribed to those terms below.

that were not purchased by Spyglass.  As such, Spyglass, as the purchaser of the Debtors' assets, did not purchase or assume the Debtors' debt obligations to Yucaipa.

Simple economic logic also supports Spyglass's position.  As Yucaipa's own witness testified, as of the Petition Date, there was no performance remaining from Yucaipa and there was no further benefit accruing under the contracts (which means they cannot be "executory" contracts under the Bankruptcy Code).  At the time of the sale, the agreements were the Debtors' liabilities to repay a loan.  It is illogical to assume that an economic buyer would assume these liabilities which provided no benefit to the buyer.  Under the circumstances, the Bankruptcy Court was correct in ruling that the purchaser of the Debtors' assets, Spyglass, did not assume those liabilities and requiring that, for Spyglass to have assumed them, the APA would have to have been clear and unequivocal on this point.

## II.    STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an order on April 4, 2019.  *See Appendix In Support of Appellee's Answering Brief* ("Appx.") 52, D.I. 2269.[2]  Yucaipa timely appealed the

---

[2]    All references to "D.I. __" refer to Bankruptcy Court Docket No. 18-10601 (MFW).

order on April 11, 2019.[3]  This Court has jurisdiction pursuant to 28 U.S.C.

§ 158(a)(1).

### III.  COUNTER-STATEMENT OF ISSUES AND STANDARD OF REVIEW

A.  Whether the Bankruptcy Court correctly concluded that the Investment Agreements were not capable of assumption and, therefore, not Purchased Assets under the APA?

B.  Whether the Bankruptcy Court properly ruled that the Investment Agreements were Liabilities and not Purchased Assets under the APA?

C.  Whether the Bankruptcy Court was right when it held that the Talent Party Agreements are distinct from the Investment Agreements?

This Court "review[s] the Bankruptcy Court's legal determinations *de novo*,

its factual findings for clear error, and its exercise of discretion for abuse thereof."

*Manus Corp. v. NRG Energy, Inc.* (*In re O'Brien Envt'l Energy, Inc.*), 188 F.3d 116,

122 (3d Cir. 1999).  When interpreting the legal effect of a contract, this Court

reviews the lower court's legal determinations *de novo*.  *See Viera v. Life Ins. Co. of

North America*, 642 F.3d 407, 413 (3d Cir. 2011) ("We also review the legal

interpretation of contractual language *de novo*."); *Heasley v. Belden & Blake Corp.*,

2 F.3d 1249, 1254 (3d Cir. 1993).  As the APA and related documents are

unambiguous, *de novo* is the appropriate standard of review by this Court.  *See, e.g.,*

---

[3]    *See Appx.* 54, D.I. 2292.

*Skold v. Galderma Labs. L.P.*, 917 F.3d 186, 191 n.9 (3d Cir. 2019) ("[W]e review the interpretation of an unambiguous contract de novo.").

## IV.    STATEMENT OF THE CASE

### A.    Bankruptcy Filing and Sale to Spyglass

On March 19, 2018 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed chapter 11 cases to facilitate a sale of substantially all of their assets under section 363 of title 11 of the United States Code (the "Bankruptcy Code").[4]  The Debtors filed a bid procedures and sale motion on the Petition Date, with Spyglass serving as the stalking horse bidder.[5]

Spyglass's offer remained the highest and best offer received by the Debtors for their assets even after the post-petition sale process.[6]

The Bankruptcy Court approved the sale of substantially all of the Debtors' assets (the "Sale") to Spyglass on May 9, 2018 (the "Sale Order")[7] for $287 million pursuant to that certain *Asset Purchase Agreement by and Among The Weinstein Company Holdings LLC, the Persons Listed on Schedule 1 Hereto and Lantern*

---

[4]    *See Appx.* 1, D.I. 8, ¶ 10.

[5]    A "stalking horse bidder" provides the initial, baseline bid for a debtor's assets, against which other parties may bid.  If the debtor does not receive a higher or otherwise better bid, the stalking horse bid will prevail.

[6]    *See Appx.* 7, D.I. No. 846.

[7]    *See id.*

*Entertainment LLC*, dated as of March 19, 2018 (as subsequently amended, the "APA").[8]

## B.    The APA, as Amended, and the Contract Notices

The Sale closed on July 13, 2019 (the "Closing").  Prior to the Closing of the Sale, the Debtors and Spyglass entered into two amendments to the APA.[9]  The Debtors, Spyglass, and the Official Committee of Unsecured Creditors (the "Committee") extensively negotiated the second amendment (the "Second Amendment").[10]  A key deal point requested by the Committee in the Second Amendment was that the outside date by which Spyglass would determine which executory contracts it desired to take assignment of would be 120 days from the effective date of the Second Amendment—November 8, 2019 (the "Assumption Outside Date").[11]

The Debtors filed seven (7) notices of potential assumption and assignment of contracts, and on the Assumption Outside Date, Spyglass filed its eighth and final notice of potential assumption of contracts (each, a "Contract Notice" and,

---

[8]    *See Appx.* 15, D.I. 1202.

[9]    *See Appx.* 7, D.I. 846, *see also See* Appx. 14; D.I. 1187.

[10]    *See Appx.* 19, D.I. 1232, at 21:7-24; 22:11-25; 23:1-12.

[11]    *See id.,* at 33:3-5; 40:23-25; *see also Appx.* 14, D.I. 1187, at ¶ 2(a).

collectively, the "Contract Notices").[12]  The Investment Agreements appeared on the

May 10th Contract Notice.[13]

> The May 10th Contract Notice contained the following standard disclaimer:
>
>> [T]he presence of an Assumed Contract and Lease listed on Exhibit 1 attached hereto does not constitute an admission that such Assumed Contract and Lease is an executory contract or unexpired lease or that such Assumed Contract and Lease will be assumed and assigned as part of the Sale. The Debtors reserve all of their rights, claims and causes of action with respect to the Assumed Contracts and Leases listed on Exhibit 1 attached hereto.[14] [15]

Yucaipa and Spyglass agree that the Investment Agreements were not executory as

of the Petition Date.[16]

> The June 8th Contract Notice contained a conspicuous statement noting that

certain previously listed contracts were being removed because the Debtors

determined that such contacts were not executory, and therefore, incapable of

---

[12]    *See Appx.* 2, D.I. 216 (Apr. 13, 2018), 282 (Apr. 20, 2018), 482 (Apr. 27, 2018), 860 (May 10, 2018), 1003 (June 8, 2018), 1457 (Sept. 5, 2018), 1512 (Sept. 20, 2018), 1665 (Nov. 5, 2018), 1695 (Nov. 8, 2018).

[13]    *See Appx.* 8, D.I. 860.

[14]    *Id.*, p. 2.

[15]    Each of the Contract Notices other than the November 8th Contract Notice (notably, the final Contract Notice), contained similar disclaimers.  *See Appx.* 2, D.I. 216 (Apr. 13, 2018), 282 (Apr. 20, 2018), 482 (Apr. 27, 2018), 860 (May 10, 2018), 1003 (June 8, 2018), 1457 (Sept. 5, 2018), 1512 (Sept. 20, 2018), 1665 (Nov. 5, 2018), 1695 (Nov. 8, 2018).

[16]    *See Appx.* 43, D.I. 2110, *passim*; *Appx.* 47, D.I. 2202, *passim*; *Appx.* 48, D.I. 2204 (sealed).

assumption and assignment under section 365 of the Bankruptcy Code.[17]  The June 8th Contract Notice also contained the following statement designed to put contract counterparties on notice that notwithstanding the fact that their contracts were not executory, Spyglass could elect to purchase the Debtors' rights under such non-executory contracts under section 363 of the Bankruptcy Code: "Notwithstanding that the contracts set forth on Exhibit A are not executory contracts and are not being assumed and assigned pursuant to Section 365 of the Bankruptcy Code, the Asset Purchase Agreement provides for the purchase, by Lantern, of any rights or assets transferred to the Debtors pursuant to such contracts."[18]

The Debtors removed eight (8) of the Investment Agreements, which had been previously listed out of an abundance of caution, in the June 8th Contract Notice.[19][20] Spyglass removed nine (9) additional Investment Agreements from the November 8th Contract Notice and designated such Investment Agreements as "Excluded

---

[17]     *See Appx.* 9; D.I. 1003, ¶¶ 5-6.

[18]     *Id.*, ¶ 7.

[19]     *Id.*

[20]     Despite the Debtors having removed eight (8) of the Investment Agreements, Yucaipa insists that all of the Investment Agreements remained on that list.  *See, generally*, *Appx.* 43, D.I. 2110; *Appx.* 50, D.I. 2231; *Appx.* 49, D.I. 2230 (sealed); Opening Brief, at Civ. D.I. 11.

Contracts."[21][22]  As of the November 8th, only one Investment Agreement remained on the Contract Notices.[23]

Thus, as of the Assumption Outside Date, the Debtors or Spyglass had removed all but one of the Investment Agreements from the Contract Notices.  In other words, the Investment Agreements were not slated for assumption and assignment and constituted "Excluded Liabilities" under § 2.4(f) of the APA.[24]

## C.    The Talent Party Litigation

On January 14, 2019, the Bankruptcy Court conducted a hearing in connection with, among other things, arguments raised by certain work-for-hire parties, and in particular, Bruce Cohen, that their agreements with the Debtors (collectively the

---

[21]    *See Appx.* 26, D.I. 1695.

[22]    The term "Excluded Contract" has the meaning given to it in the Sale Order, which in turn references the definition in the APA.  *See id*.  The term "Excluded Contract" under the APA has the meaning set forth on Schedule 2.2 thereto.  *See Appx.* 15, D.I. 1202, at Sch. 2.2.  Schedule 2.2(h) provides that all Contracts that are not Assumed Contracts are Excluded Contracts.  *Id.* at Sch. 2.2(h).

[23]    *See id.*

[24]    The Assumption Outside Date was established through the Second Amendment to the APA.  *See Appx.* 14, D.I. 1187, at § 2(e); *Appx.* 15, D.I. 1202, at § 2.8(a).  The Assumption Outside Date—the final date by which Spyglass could designate executory contracts for assumption and assignment—was heavily negotiated by the Debtors, Spyglass, and the Committee.  *See Appx.* 19, D.I. 1232, at 21:7-24; 22:11-25; 23:1-12; *see also*, *Appx.* 15, D.I. 1202, at § 2.8(i).  Thus, the negotiated Assumption Outside Date plainly contradicts Yucaipa's argument that Spyglass automatically assumed the Investment Agreements because Spyglass was required to notify parties of its decision whether to assume or assign an executory contract prior to the July 13, 2018 Closing.

"Talent Party Agreements") were executory as of the Petition Date, and that therefore, Spyglass was required to cure all defaults thereunder prior to taking assignment of such agreements (the "Talent Party Litigation").[25]

Spyglass asserted in the Talent Party Litigation that the Talent Party Agreements were not executory and, therefore, could not be assumed and assigned to Spyglass, but that Spyglass had instead purchased the rights under the Talent Party Agreements under section 363 of the Bankruptcy Code and designated such agreements as "Purchased Assets" under the APA.[26]

While the Talent Party Agreements had been fully performed by the Talent Parties and were thus no longer executory,[27] the Talent Party Agreements contain valuable and material intellectual property rights associated with certain films, referred to as "Covered Titles" under the APA,[28] which Spyglass purchased in the

---

[25]    *See, e.g., Appx.* 22, Adv. Pr. No. 18-50924, D.I. 10, at Arg. IV.C, at 14–27.

[26]    *See, e.g., Appx.* 34; D.I. 1939, Arg. B, at 18-28; *Appx.* 36, D.I. 1944 (sealed).

[27]    "[A] contract is executory only where the obligations of both the bankrupt and the other party to the contract are *so far unperformed* that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *In re Waste Sys. Int'l, Inc.*, 280 B.R. 824, 826 (Bankr. D. Del. 2002) (citations omitted) (emphasis added).

[28]    The APA provides that Spyglass acquired from the Seller Parties free and clear of all Liens the "Purchased Assets," which included all "direct or indirect right, title and interest in, to or under the Business and all of Seller Parties' property, rights, Claims and assets of every kind and description, wherever situation or located, real, personal or mixed, tangible or intangible, wither identifiable or contingent, owned, leased, licenses, used or held for use in or relating to the Business, whether or not reflected on the books and records of the Seller Parties, as the same shall exist on

9

Sale. Included among these intellectual property rights were copyrights in the Covered Titles, and also full ownership and exploitation rights[29] in the Covered Titles.

At the conclusion of the hearing in the Talent Party Litigation, the Bankruptcy Court issued a bench ruling (the "TP Bench Ruling").[30] In the TP Bench Ruling, the Bankruptcy Court ruled that the Talent Party Agreements related to Bruce Cohen (the "Cohen Agreement") were not executory and that Spyglass had purchased the Cohen Agreement under section 363 of the Bankruptcy Code (*i.e.,* that the Cohen Agreement was a "Purchased Asset" under the APA), free and clear of all prior liens,

---

the Closing Date." *See Appx.* 15, D.I. 1202, at § 2.1. Schedule 2.1 to the APA identified certain specific assets that were included in the "Purchased Assets," which included "Covered Titles." These Covered Titles were then listed on Annex 1 to the APA. The films that relate to the Talent Party Agreements are all "Covered Titles" under the APA. *See id.,* at § 3.10, Schedule 2.1(b), and Annex 1.

[29]     *See, e.g., Appx.* 34, D.I. 1939, Ex. A, Cohen Agreement, § 9 (providing that the Debtors possessed exclusive ownership of and rights in and to *Silver Linings Playbook*, including all copyrights, merchandising rights, and exploitation rights, and that the Cohen Agreement was a work-for-hire agreement, which did not confer any such rights on Cohen; *Appx.* 36, D.I. 1944 (sealed).

[30]     The TP Bench Ruling was implemented by the *Order (I) Granting Lantern Entertainment LLC's Motion for Summary Judgment; (II) Denying Motion to Strike of Contract Counterparties; (III) Denying in Part, and Granting in Part, Joint Motion of SLP Contract Counterparties to Clarify Sale Order; and (IV) Denying in Part, and Granting in Part, Contract Counterparties' Motion for Order Confirming that Counterparties' Agreements have been Designated by Lantern for Assumption and Assignment, Including Joinder of Committee. See Appx.* 43, D.I. 2013.

10

claims, and encumbrances, but that Spyglass was obligated to perform under the Cohen Agreement post-Closing.[31] [32]

## D.    The Investment Agreements

Prior to the Petition Date, certain of the Debtors were party to various financing agreements with Yucaipa (collectively, the "Investment Agreements") relating to a number of the Debtors' film projects.[33]

The Investment Agreements are largely identical contracts by which Yucaipa, self-described as "Financier," agreed to contribute a certain amount of money to facilitate the production of various films by Debtor The Weinstein Company LLC or its affiliate ("TWC"), in exchange for a portion of the gross receipts earned by TWC upon exploitation of such films.[34]  TWC retained creative control over "all

---

[31]    *Appx*. 41, D.I. 2005, at 133:8-25, 134-137.

[32]    Spyglass had already agreed to perform post-Closing obligations under certain Purchased Assets under the Second Amendment.  *Appx*. 14, D.I. 1187, at § 2(a).

[33]    The Investment Agreements pertain to the following films:  *The Upside; August Osage County; Crouching Tiger Hidden Dragon; Lawless; Mandela – Long Walk to Freedom; Our Idiot Brother; Philomena; Quartet; The Details; The Giver; The Iron Lady; and The Sapphires* (collectively, the "Films").

[34]    While the Investment Agreements are largely identical, not all terms are contained in each agreement.  *See Appx*. 47, D.I. 2202, at Ex. A (a chart identifying the applicable debt characteristics of each Investment Agreement); *Appx*. 48, D.I. 2204 (sealed).

11

matters relating to the distribution of the Picture."[35]   The Investment Agreements

further provide:



<hr />

[35]      *See Appx.* 45, D.I. 2112, Ex. H-1, at ¶ 3; *Appx.* 44, D.I. 2111 (sealed).

[36]      *Id.* ¶ 5.

[37]      *Id.* ¶ 9.

[38]      *Id.* ¶ 11. ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████. *See id.*, Ex.
A-1 ¶¶ 2(d) & 2(e), Ex. M at 1 (Omnibus Amendment); *see also Appx.* 52, D.I. 2282,
31:22-24, 32:11-16.

████████████████████████████████████████
████████████████████████████████████ [39]

Further, Yucaipa's own witness, who negotiated and signed all of the Investment Agreements,[40] testified that the agreements were to provide funding for the Films and that the Debtors, in at least one instance, guaranteed such debt obligations.[41]  The witness, Mr. Bermingham, testified that Yucaipa served as the "Financier" under the Investment Agreements, that Yucaipa neither received nor retained an ownership interest in the Films, had no involvement in any creative aspects of the production of the Films, had no right of authorship, and had no intellectual property rights.[42]  He further testified that the Investment Agreements were treated as investments in the profits of the Films; that Yucaipa's return under the Investment Agreements would come in the form of "gross proceeds, potential gross proceeds, of the [Films] pursuant to the distribution waterfalls in each [Investment] [A]greement"; and that these returns were contingent upon the Films performing well.[43]  Mr. Bermingham testified that Yucaipa was participating as a

---

[39]    *See id.*, at Ex. H-1, ¶ 11.  ████████████████████████████
████████████████████████████████████  *see, e.g.*, *id.*, at Ex. G-3 ¶ 4 (*Philomena*) & Ex. J-2 ¶ 4 (*The Giver*), ████████████████████████████████  *see* Ex. G-3 ¶ 5 & Ex. A thereto (*Philomena*); Ex. J-2 ¶ 5 & Ex. A thereto (*The Giver*).

[40]    *See Appx.* 53, D.I. 2282, at 29:18-20.

[41]    *See id.* at  32:2-16.

[42]    *Id.*, at 32:17-25, 33:1-14, 35:4-13, 37:4-7.

[43]    *Id.*, at 36:21-25, 37:1-7.

lender with respect to the Films and negotiating "*intercreditor*" agreements and similar documents with TWC's bank.[44]  He acknowledged that Yucaipa had a right to be repaid on its debt only if the Films generated gross receipts.[45]

In sum, the terms of the Investment Agreements, together with Mr. Bermingham's testimony, establish that the Investment Agreements are non-recourse debt instruments.  Section 2.4 of the APA sets forth a non-exclusive list of "Excluded Liabilities," which includes "any indebtedness for borrowed money, bank loans or facilities or any other debt instruments.[46]  Section 2.4(f) of the APA provides that "all Liabilities arising under any Contract that is not an Assumed Contract" is an "Excluded Liability."[47]   As noted above, all but one[48] of the Investment Agreements were removed from the Contract Lists by the Assumption Outside Date, and thus, were not "Assumed Contracts."[49]

---

[44]      *Id.*, at 36:5-13 (emphasis added).

[45]      *Id.,* at 37:12-24.

[46]      *See Appx.*, 15, D.I. 1202, at § 2.4(c).

[47]      *Id.*, at §2.4(f).

[48]      The fact that a single Investment Agreement remained on the November 8th Contract List is not dispositive, as its appearance on that list cannot transform the Investment Agreement into an Assumed Liability, an Assumed Contract, or a Purchased Asset under the final and non-appealable Sale Order.

[49]      *See Appx.* 26, D.I. 1695.

14

Yucaipa and Spyglass concur that there were no material obligations of both parties outstanding as of the Petition Date, and as such, the Investment Agreements are not executory.[50]

## E. The Yucaipa Litigation

On February 20, 2019, a little over one month after the Bankruptcy Court issued the TP Bench Ruling, Yucaipa filed a motion seeking to (a) enforce the Sale Order, (b) confirm that Spyglass assumed the liabilities under the Investment Agreements through the Sale, and (c) compel Spyglass to perform under the APA— *i.e.,* to repay the prepetition loans made to the Debtors under the Investment Agreements.[51]  Yucaipa admitted that the TP Bench Ruling inspired it to bring this action against Spyglass.[52]

On April 2, 2019, the Bankruptcy Court heard arguments and testimony in connection with Yucaipa's motion and related pleadings.  At the conclusion of that hearing, the Bankruptcy Court issued a bench ruling (the "Y Bench Ruling")[53]

---

[50]    *See Appx.* 43, D.I. 2110, *passim*; *Appx.* 47, D.I. 2202, *passim*; *Appx.* 48, D.I. 2204 (sealed).

[51]    *See Appx.* 43, D.I. 2110.

[52]    *See Appx.* 53, D.I. 2282, at 38:16-21.

[53]    The Y Bench Ruling was implemented by the *Order (I) Denying Motion of Y Movie, LLC, Y Theatrical, LLC, YFE Holdings, Inc., OA3, LLC, and RMF, LLC to (A) Enforce Sale Order, (B) Confirm Assumption of Liabilities by Lantern Entertainment LLC Pursuant to Asset Purchase Agreement, and (C) Compel Performance by Lantern Entertainment LLC under Asset Purchase Agreement* (the "Order").  *See Appx.* 52, D.I. 2269.

denying Yucaipa's motion. In the Y Bench Ruling, the Bankruptcy Court noted that

Yucaipa and Spyglass agreed that the Investment Agreements are not executory.

The Bankruptcy Court also ruled, among other things, that:

- The entirety of § 2.8 of the APA makes it clear that it applies to the assumption of executory contracts.

- The second amendment to the APA clarified that § 2.8 applies only to executory contracts.

- It was clear that only executory contracts could be assumed by a debtor and assigned to a buyer under section 365 of the Bankruptcy Code.

- The Investment Agreements are not "Assumed Contracts."

- The Investment Agreements did not relate to the Debtors' ongoing business once the invested funds were paid, and that the only significant remaining obligation as of the Petition Date was the obligation of the Debtors to repay the funds out of future gross revenues, and this did not constitute a "right," but rather a "liability or obligation."

- As a non-executory contract cannot be an "Assumed Contract," it is an Excluded Liability.

- The rights remaining under the Investment Agreements on the Petition Date did not relate directly to Covered Titles and were insufficient to qualify as "Title Rights."

- The Investment Agreements are distinguishable from the Talent Party Agreements, and not only because Spyglass designated the Talent Party Agreements for purchase, but also because there were significant, desirable intellectual property rights related to the Covered Titles under the Talent Party Agreements. Further, the Investment Agreements "expressly state that there are no such rights that the investment parties have in the films or the titles," and that "there were no

16

significant rights left and certainly none that are remotely related or similar to the Cohen type rights."[54]

## V.    ARGUMENT

### A.    The Bankruptcy Court correctly concluded Spyglass did not purchase the Investment Agreements under the APA.

1.    *The Investment Agreements are not executory, cannot be assumed under section 365(a) of the Bankruptcy Code as a matter of law, and were not purchased under the APA.*

The Bankruptcy Court correctly found that, as a matter of law, non-executory contracts, such as the Investment Agreements, cannot be assumed and assigned under section 365 of the Bankruptcy Code, and therefore, that Spyglass could not and did not take assignment of the Investment Agreements.  This is black letter bankruptcy law.

Yucaipa's argument hinges upon the fact that its admittedly non-executory Investment Agreements were included on the June 8th Contract List.  "Therefore," because all "Assumed Contracts" are Purchased Assets, "each Investment Agreement was explicitly identified as a Purchased Asset" on the June 8th Contract List.[55]  This argument fails from the outset, however, because Assumed Contracts must be executory under the plain terms of the APA and as a matter of law under

---

[54]    *See Appx.* 53, D.I. 2282, at 57:1-25-60:1-25.

[55]    *See Appx.* 43, D.I. 2110, ¶ 8.

section 365 of the Bankruptcy Code.  It also fails in light of the clear disclaimer featured in the Contract Notices and, in particular, the June 8th Contract Notice.[56]

Section 2.8(a) of the APA, entitled "Available Contracts," defines "Available Contracts" as the "list [set forth on section 2.8(a) of the Disclosure Schedules to the APA] of all *executory* Contracts relating to the Business or the Purchased Assets to which one or more of Seller Parties are party" (emphasis added).  The same section specifies that "Buyer . . . shall designate in writing *which Available Contracts from Section 2.8(a) of the Disclosure Schedule* . . . that Buyer wishes to 'assume' (the 'Assumed Contracts')."[57]  It is clear from the APA that in order for an agreement to be an Available Contract, and therefore an Assumed Contract, it must be executory.[58]

---

[56]    The June 8th Contract Notice contained the following disclaimer: "Notwithstanding that the contracts set forth on Exhibit A are not executory contracts and are not being assumed and assigned pursuant to Section 365 of the Bankruptcy Code, the Asset Purchase Agreement provides for the purchase, by Lantern, of any rights or assets transferred to the Debtors pursuant to such contracts." *See Appx.* 9, D.I. 1003, at ¶ 7.

[57]    *See Appx.* 15, D.I. 1202, at § 2.8(a) (emphasis added).

[58]    The fact that the word "executory" was added as part of the Second Amendment to the APA is of no moment.  Paragraph 9 of the Second Amendment to the APA expressly provides that no third party may rely on anything in the amendment as an admission "as to the correct interpretation of any provision of the [APA] (including any provision that is amended hereby [*i.e*., section 2.8(a)])" or that Spyglass "has breached or failed to perform or comply with any of its covenants or agreements" in the APA.  *See Appx.* 14, D.I. 1187, at ¶ 9.

Yucaipa admits that each of the Investment Agreements was non-executory as of the Petition Date,[59] which occurred almost two months before the Sale was approved by the Court and four months before the Sale closed.  Under section 365 of the Bankruptcy Code, a debtor is permitted only to assume executory contracts and unexpired leases.[60]  Because the Investment Agreements were not executory as of the Petition Date, they were not "available" to serve as Available Contracts subject to assumption and assignment as Assumed Contracts under the APA.[61]

---

[59]    *See Appx.* 43, D.I. 2110, at  ¶ 3 ("[Yucaipa] fully satisfied [its] obligations under the Investment Agreements prior to the Petition Date, thereby rendering the Investment Agreements non-executory when these Chapter 11 Cases . . . commenced.").

[60]    11 U.S.C. § 365(a) ("[T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."); *In re Exide Techs.*, 378 B.R. 762, 765 (Bankr. D. Del. 2007) ("Section 365 allows debtors to assume or reject an executory contract, but provides no such option for a non-executory contract.").  "[A] contract is executory only where the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other."  *In re Waste Sys. Int'l, Inc.*, 280 B.R. 824, 826 (Bankr. D. Del. 2002) (citations omitted).

[61]    Ironically, Yucaipa relies on the same "executory" language to contend that its Investment Agreements cannot be Excluded Contracts, and therefore Excluded Assets, because they are non-executory.  *See Appx.* 43, D.I. 2110, at ¶¶ 10-12, 17 (citing section 2.8(a) of the APA, which provides in relevant part that "[a]ll executory Contracts of the Seller Parties that are listed on Section 2.8(a) of the Disclosure Schedule [i.e., Available Contracts] as of the Closing Date and which Buyer does not designate in writing for assumption shall not be considered Assumed Contracts or Purchased Assets and shall automatically be deemed 'Excluded Contracts' . . .").  Nevertheless, in an abundance of caution, Spyglass listed certain of the Investment Agreements as Excluded Contracts on the November 8th Contract Notice.

In addition, the Court should reject Yucaipa's arguments that the Investment Agreements were assumed under Section 2.8 of the APA, as contracts that relate to the Business or the Purchased Assets. The term "Business" is defined in the APA to mean "the business of developing, producing, distributing and otherwise Exploiting motion pictures, television programs and other audio visual content as currently conducted by the Seller Parties."[62]

The term "Exploit" means:

> [W]ith respect to a Covered Title, the exhibition, distribution, reproduction, development, subdistribution, transmission, display, broadcast, performance, dissemination, publication, production, co-production, promotion, publicizing, advertising, reproduction, rental, leasing, subleasing, selling, licensing, sublicensing, transfer, disposal of, commercializing, marketing, usage, trading in, turning to account, dealing with and in and otherwise exploiting such Covered Title by any means, methods, processes, media devices and delivery systems of every kind or character, whether now known or hereafter created, including, without limitation, the right to exercise the ancillary rights relating thereto and to produce and develop such Covered Titles (including derivative rights therein), to the extent included in the Title Rights. The meaning of the term "Exploitation" shall be correlative to the foregoing.[63]

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  Rather, as Mr. Bermingham testified,

---

[62]     *See Appx.* 15, D.I. 1202, at Ex. A-2.

[63]     *Id.*, at Ex. A-6.

Yucaipa had no involvement in any creative aspects of the production of the Films, and instead was participating as a lender—a lender whose right to repayment was contingent upon the Films generating gross receipts.  In sum, Mr. Bermingham's testimony confirms that the Investment Agreements were non-recourse debt instruments and were not related to the operation of the Business or the Exploitation of the Films.[64]

Finally, Yucaipa argues that the inclusion of the disclaimer in the June 8th Contract Notice,[65] which was designed to put counterparties on notice that non-executory contracts *may* be purchased under the APA, somehow constitutes an admission that the Investment Agreements were slated for purchase by Spyglass under the APA.  This is mere wordplay, however.  It is inaccurate, illogical, and unreasonable to conclude that Spyglass impliedly assumed *millions of dollars of debt obligations with no corresponding benefit* based on a disclaimer the Debtors included in the June 8th Notice.[66]

---

[64]     *See* Section IV.D., above.

[65]     *See Appx.* 9, D.I. 1003, at ¶ 7.

[66]     Moreover, the Debtors later removed the Investment Agreements, which means that under the APA, they were no longer to be included as items to be purchased.  Thus, while Yucaipa's logic is flawed, even if followed, it should be followed to its conclusion, which would require acknowledging that the removal of the Investment Agreements from the list of Assumed Contracts prior to the Assumption Outside Date turned them back into Excluded Assets.

2.    *Even if the Investment Agreements were executory, which they are not, they are not capable of assumption and assignment under section 365(c)(2) of the Bankruptcy Code.*

Even assuming *arguendo* that the Investment Agreements were executory (which Yucaipa concedes they are not), the Investment Agreements would constitute contracts to make a loan or extend debt financing or financial accommodations to the Debtors with respect to each applicable Film.   As such, the Investment Agreements are not capable of being assumed and assigned to Spyglass and are not Assumed Contracts under the express provisions of the Bankruptcy Code.

This is so because section 365(c)(2) of the Bankruptcy Code prohibits a debtor from assuming and assigning an executory contract "if such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor."  Thus, "there is no way that a debtor can assume [a financing] agreement." *Watts v. Pa. Housing Fin. Co.* (*In re Watts*), 876 F.2d 1090, 1095 (3d Cir. 1989).

Courts narrowly construe the terms "loan," "debt financing," and "financial accommodation."  *In re Sportsman's Warehouse, Inc.*, 457 B.R. 372, 392 (Bankr. D. Del. 2011).

A debt instrument is an obligation where a borrower promises to repay the lender pursuant to the terms of a contract.  *Black's Law Dictionary* 404 (10th ed. 2014).  Non-recourse debt is debt that is secured by collateral but for which the

22

borrower does not provide any additional promise to repay. *Id.* at 1056.  Under the Investment Agreements, Financier loaned money to TWC to produce the Films and TWC promised to repay that money if the applicable Film generated sufficient gross receipts.  ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████  In sum, it is clear that the Investment Agreements between TWC and Yucaipa, as Financier, were straightforward, non-recourse debt instruments.[67]

Further, the term "financial accommodations" refers to "'the extension of money or credit to accommodate another.'" *Id.* (quoting *Nat'l Bank v. Thomas B. Hamilton Co. (In re Thomas B. Hamilton Co.)*, 969 F.2d 1013, 1019 (11th Cir. 1992)).  According to the legislative history of section 365(c)(2) of the Bankruptcy Code, the "[c]haracterization of contracts to make a loan, or extend other debt financing or financial accommodations, is limited to the extension of cash or a line of credit and is not intended to embrace ordinary leases or contracts to provide goods or services with payments to be made over time." *In re Best Prod. Co., Inc.*, 210

---

[67]    Spyglass purchased the Debtors' assets free and clear of all claims, liens, and encumbrances under section 363(f) of the Bankruptcy Code, including the debts the Debtors owed under the Investment Agreements. *See Appx.* 7, D.I. 846, at ¶¶ AA, BB, FF, GG, 12-16, 29, 32.

B.R. 714, 717 (Bankr. E.D. Va. 1997) (quoting 124 Cong. Rec. H11089 (daily ed. Sep. 28, 1978) (statement of Rep. Edwards)).

Courts look to the contract as a whole, not specific clauses, to determine whether a contract is a financial accommodation. *See In re United Airlines, Inc.*, 368 F.3d 720, 724 (7th Cir. 2004). Therefore, the test is whether the principal purpose of the contract is "to extend financing to or guarantee the financial obligations of the debtor." *Sportsman's Warehouse*, 457 B.R. at 393 (quoting *In re Thomas B. Hamilton Co.*, 969 F.2d at 1019)). A contract for which the "extension of credit is only incidental to or a part of a larger arrangement involving the debtor" will not be treated under 365(c)(2) of the Bankruptcy Code. *In re Thomas B. Hamilton Co.*, 969 F.2d at 1019. Furthermore, "in nearly every instance where a financial accommodation has been found to exist, the debtor has been directly or secondarily liable for the debt incurred." *Best Prod.*, 210 B.R. at 717.

Applying these principles to the Investment Agreements, Yucaipa, as Financier, contributed a substantial sum to TWC toward each respective Film's budget.[68] ███████████████████████████████████████

███████████████████████████████████████

---

[68]    *See, e.g., Appx.* 45, 2112, Ex. A-1, at § 2; *Appx.* 44, D.I. 2111 (sealed); *see also Appx.* 53, D.I. 2282, at 32:17-25, 33:1-14, 35:4-13, 37:4-7.



[71]   In sum, each Investment Agreement was a contract to extend financing to the Debtors.

As a result, each of the Investment Agreements constitutes an agreement to extend "debt financing" and/or make a "financial accommodation" under section 365(c)(2) of the Bankruptcy Code.  The principal purpose of each Investment Agreement was to extend financing to facilitate the production of the Films, clearly intending to benefit TWC.

Accordingly, the Investment Agreements could never constitute Assumed Contracts for the additional reason that they are agreements to make a loan, or extend

---

[69]   *Appx.* 45, 2112, Ex. A-1; *Appx.* 44, D.I. 2111 (sealed).

[70]   *Id.*

[71]   *Id.*, at § 5.

other debt financing or financial accommodations, that are not capable of assumption

and assignment under section 365(c)(2) of the Bankruptcy Code.

3.    *The Investment Agreements are not Title Rights*.

Yucaipa argues further that the Investment Agreements also constitute "Title

Rights" under the APA, because the definition of Title Rights includes "the Assumed

Contracts and all other contract rights with respect to each Covered Title" under the

APA.[72]  However, as discussed above, the Investment Agreements are not Assumed

Contracts, and therefore they are not Title Rights.[73]  Indeed, Yucaipa has no interest

in the Covered Titles beyond its initial, prepetition financial investment.[74]

---

[72]    *See Appx*. 15, D.I. 1202, at Ex. A-13.

[73]    As discussed in section IV.B. below, there also can be no argument that the Investment Agreements are "contract rights" purchased by Spyglass.  To the contrary, only obligations allegedly owed to Yucaipa remain under the Investment Agreements, and those obligations are Excluded Liabilities for which Spyglass is not responsible.

[74]    In their Opening Brief, Yucaipa argues for the first time that the Bankruptcy Court overlooked that the Debtors are entitled "to receive guidance and input from the Investment Counterparties with respect to 'production, distribution, and marketing' of the Investment Movies."  *See* Civ. D.I. 11, at p. 40.  Not only does this argument directly contradict Yucaipa's repeated admissions and avowed position that the Investment Agreements are not executory, but it was not raised before the Bankruptcy Court, and therefore should not be considered by this Court.  *See Newark Morning Ledger Co. v. U.S.*, 539 F.2d 929, 932 (3d Cir. 1976) (citing *Sanchanko v. Gill*, 388 F.2d 859, 861 (3d Cir. 1968)) ("We generally refuse to consider issues that are raised for the first time on appeal."); *see also Mirkowicz v. Reading Co.*, 84 F.2d 537, 538 (3d Cir. 1936) (explaining that the failure to ask the lower court to rule on an issue prevents a party from assigning error thereto).

26

**B.**     **The Obligations Under the Investment Agreements are "Excluded Liabilities" under the APA, which Spyglass did not assume.**

1.     *The Investment Agreements are "Excluded Liabilities" under the APA because they contain liabilities arising under a contract that is not an Assumed Contract.*

Yucaipa contends that Spyglass assumed all post-closing liabilities arising out of every Assumed Contract, including the Investment Agreements, under section 2.3 of the APA, entitled "Assumption of Liabilities."[75]  As the Bankruptcy Court noted separately in the chapter 11 cases, "if a contract isn't executory it's one of two things. It's either an asset or a liability.  A non-executory contract that provides that the debtor get something is an asset and [they're] buying assets.  That's clear. If it's a contract that's non-executory where the debtor owes something it's a liability and they're not assuming liabilities."[76]

When a purchaser makes a commitment to take on a liability, it is clearly delineated in the purchase agreement as "assumed liabilities."  The Assumed

---

[75]     Section 2.3 of the APA provides, in relevant part, that "Buyer shall (a) assume from the Seller Parties and thereafter pay, perform or discharge when due those Liabilities of the Seller Parties arising out of the operation of the Purchased Assets (including the Assumed Contracts) for periods following the Closing Date, except for those Liabilities that are Excluded Liabilities."  *See Appx.* 15, D.I. 1202, at § 2.3.

[76]     *See Appx.* 19, D.I. 1232 at 38:13-19.

Liabilities in this instance are no different.[77]  Spyglass expressly did not assume the liabilities under the Investment Agreements in the APA.[78]

_____

[77]    The APA is clear that Spyglass "is assuming only the Assumed Liabilities and is not assuming any other Liability of any Seller Party of whatever nature, whether presently in existence or arising hereafter.  All such other Liabilities shall be retained by and remain Liabilities of the Seller Parties (all such Liabilities not being assumed being herein referred to as the 'Excluded Liabilities'). . ."  *See Appx.* 15, D.I. 1202, at § 2.4.  Moreover, even if Spyglass wanted to assume the Investment Agreements under the Sale, which it clearly did not, it could not as a matter of law, notwithstanding the appearance of any Investment Agreement on any Contract Notice.  *See In re Exide Techs.,* 378 B.R. at 766-67 ("[T]he Joint Plan language cannot 'deem' a non-executory contract to be an executory contract so that the Debtor can assume it."); *In re Fitch*, 174 B.R. 96, 101 (Bankr. S.D. Ill. 1994) ("A debtor cannot change the nature of a contract merely by electing to assume it under [section] 365.").

[78]    Schedule 2.3 of the APA lists "Assumed Liabilities," which consist of "non-recourse project level debt relating to the following Covered Titles and represented by the credit facilities described below, the outstanding balances as of February 28, 2018 of which are set forth on Appendix I to this Schedule 2.3."  *See Appx.* 15, D.I. 1202, at Sch. 2.3. Notably, the non-recourse debt instruments entered into between the Debtors and Yucaipa (*i.e.*, the Investment Agreements) are *not* listed on Schedule 2.3 of the APA.  *See id.*  If the Investment Agreements were intended to be Assumed Liabilities, they would have been included in this section of the APA.

Specifically, section 2.4(f) of the APA contains a list of Excluded Liabilities, including "all Liabilities[79] arising under [a] Contract[80] that is not an Assumed Contract."  Because the Investment Agreements are not Assumed Contracts (as outlined above), any obligations arising thereunder also were not assumed by Spyglass under the APA.[81][82]

2. *The Investment Agreements are "Excluded Liabilities" under the APA because they are debt instruments.*

Section 2.4(c) of the APA lists as Excluded Liabilities "any indebtedness for borrowed money, bank loans or facilities or any other debt instruments."  As noted above, based on a plain reading of the Investment Agreements, and as Yucaipa's witness expressly confirmed in his testimony, the Investment Agreements are loan agreements between Yucaipa, as Financier, and TWC, as borrower.  ██████████

---

[79]    "Liabilities" is defined as "all claims, demands, expenses, commitments and obligations (whether accrued or not, known or unknown, disclosed or undisclosed, matured or unmatured, fixed or contingent, asserted or unasserted, liquidated or unliquidated, arising prior to, at or after the commencement of any bankruptcy proceeding) of or against the Seller Parties or any of the Purchased Assets."  *See Appx.* 15, D.I. 1202, at Ex. A-8.

[80]    "Contract" is defined as "any written contract, lease, license, agreement, arrangement, understanding, commitment, instrument, guarantee, undertaking, bid or proposal."  *See id.*, at Ex. A-4.

[81]    *See id.,* at § 2.4(f).

[82]    This is different from the order implementing the TP Bench Ruling, which reiterates, consistent with section 2.4(j) of the APA, that post-closing Participations generally are payable to the talent parties under Purchased Assets (subject to the terms of the APA).

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████ Financier did not receive any underlying rights in the intellectual property that is being exploited, nor did it receive or retain any ownership interest in the Films, or have any right to provide creative input with respect to the Films.

In sum, the Investment Agreements were Liabilities under the APA. The assumption of liabilities under an asset purchase agreement is factored into the purchase price and the overall benefit of the bargain being negotiated between the buyer and seller. In the same vein, the exclusion of liabilities is clearly set forth in an asset purchase agreement. Section 2.4(c) of the APA specifically and expressly listed debt instruments and financial accommodations like the Investment Agreements as Excluded Liabilities. Yucaipa cannot now, a year after the Closing of the Sale, argue that Spyglass assumed its Liabilities through the Sale by cobbling together a series of defined terms in the APA and relying on Contract Notices that contained numerous disclaimers contrary to Yucaipa's position.

3.    *The Investment Agreements are not Assumed Liabilities, as they were not listed on Schedule 2.3 of the APA.*

Likewise, a plain reading of section 2.3 and schedule 2.3 of the APA demonstrates that the Investment Agreements were not Assumed Liabilities under

30

the APA.  Schedule 2.3 sets forth specific non-recourse project level debt related to certain films and projects.  Absent from that list are the Investment Agreements.

Further, through the Second Amendment, Spyglass agreed to assume post-Closing Liabilities of the Debtors "arising out of the operation of the Purchased Assets (including the Assumed Contracts) for periods following the Closing Date, except for those Liabilities that are Excluded Liabilities. . . ."[83]  For the reasons set forth above in Sections IV.D. and V.A., the Investment Agreements did not arise out of the operation of the Purchased Assets—the Business of Exploitation of motion pictures and other similar projects.  The Investment Agreements are debt instruments, plain and simple.  When viewed against the Talent Party Agreements, which have value and contain important and exclusive copyrights and exploitation rights, it is apparent that the Investment Agreements have no value to the purchaser and, therefore, and were not acquired by Spyglass.  This is why Spyglass agreed to pay post-Closing obligations under the Talent Party Agreements (as Purchased Assets) through the Second Amendment.

Finally, section 2.3 of the APA, as amended, covers only post-Closing liabilities, and not the Debtors' obligations under the Investment Agreements that arose prior to the Petition Date.

---

[83]    *See Appx.* 14, D.I. 1187, § 2(a).

31

**C.    The Talent Party Agreements are distinguishable from the Investment Agreements, because the Talent Party Agreements have value, whereas the Investment Agreements are Liabilities.**

As the Bankruptcy Court correctly found in the Talent Party Litigation, the Talent Party Agreements are work-for-hire agreements, which conveyed significant and important rights to the Debtors, including intellectual property rights, ownership rights, and exploitation rights.[84]  The Bankruptcy Court similarly correctly held in the Y Bench Ruling that the Investment Agreements were liabilities of the Debtors that had no cognizable value for purchase by Spyglass.  Spyglass had no reason to purchase these debt obligations because, unlike the work-for-hire Talent Party Agreements, the Investment Agreements do not add value; Yucaipa already provided the funds to the Debtors, and all that remains is a payment obligation of the Debtor counterparty.  Indeed, such liabilities were specifically listed as Excluded Liabilities and were not listed as Assumed Liabilities.  Yucaipa cannot shoehorn its general unsecured claims against the Debtors' estates (on account of unpaid, pre-Closing investments) into 100-cent dollar liabilities of Spyglass through a tortured and circuitous reading of the defined terms in the APA.  As the Bankruptcy Court found, a plain reading of the APA does not support Yucaipa's position.

*[Remainder of page intentionally left blank.]*

---

[84]      *See, e.g., Appx.* 34, D.I. 1939, Ex. A, Cohen Agreement, § 9.

## VI.    CONCLUSION

For the reasons set forth herein, the Bankruptcy Court correctly held that the Investment Agreements (i) are not executory contracts capable of assumption and, therefore, not Purchased Assets, (ii) are liabilities that were not Purchased Assets under the APA, and (iii) the Talent Party Agreements are plainly distinguishable from the Investment Agreements (as the former represented assets for purchase, while the latter represented liabilities of the Debtors).  Thus, Spyglass respectfully submits that this Court should affirm the Bankruptcy Court's Order and the underlying Y Bench Ruling.

Dated: July 15, 2019

  */s/ R. Craig Martin*
R. Craig Martin (DE No. 5032)             Thomas R. Califano
Maris J. Kandestin (DE No. 5294)          Rachel Ehrlich Albanese
DLA PIPER LLP (US)                        DLA PIPER LLP (US)
1201 N. Market Street, Suite 2100         1251 Avenue of the Americas
Wilmington, DE 19801                      New York, NY 10020
Telephone:  (302) 468-5700               Telephone:  (212) 335-4500
Facsimile:  (302) 394-2341               Facsimile: (212) 335-4501
Email:craig.martin@dlapiper.com           Email:thomas.califano@dlapiper.com
     maris.kandestin@dlapiper.com              rachel.albanese@dlapiper.com

*Counsel to Spyglass Media Group, LLC (f/k/a Lantern Entertainment LLC)*

33