IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| THE WEINSTEIN COMPANY HOLDINGS, LLC, *et al*., | : | Bankr. No. 18-10601-MFW |
| | : | (Jointly Administered) |
| Debtors. | : | |
| _____ | : | |
| | : | |
| Y MOVIE, LLC, Y THEATRICAL, LLC., | : | |
| YFE HOLDINGS, INC., OA3, LLC, AND RMF LLC, | : | |
| | : | |
| Appellants, | : | Civ. No. 19-675-MN |
| v. | : | |
| | : | |
| SPYGLASS MEDIA GROUP, LLC (f/k/a LANTERN | : | |
| ENTERTAINMENT LLC), | : | |
| | : | |
| Appellee. | : | |

## <u>MEMORANDUM OPINION</u>

Michael R. Nestor, Andrew L. Magaziner, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE; Robert A. Klyman, Matthew G. Bouslog, Eric T. Haitz, GIBSON, DUNN, & CRUTCHER LLP, Los Angeles, CA – Attorneys for Appellants Y Movie, LLC, Y Theatrical, LLC, YFE Holdings, Inc., OA3, LLC, and RMF, LLC.

R. Craig Martin, Maris J. Kandestin, DLA PIPER LLP (US), Wilmington, DE; Thomas R. Califano, Rachel Ehrlich Albanese, DLA PIPER LLP (US), New York, NY – Attorneys for Appellee Spyglass Media Group, LLC (f/k/a Lantern Entertainment LLC)

April 2, 2020

**NOREIKA, U.S. DISTRICT JUDGE**

Pending before the Court is an appeal by appellants Y Movie, LLC, Y Theatrical, LLC, YFE Holdings, Inc., OA3, LLC, and RMF, LLC (together, "Appellants" or "Yucaipa") from the Bankruptcy Court's order dated April 4, 2019 (B.D.I. 2269)[1] ("Order"), entered in the Chapter 11 cases of The Weinstein Company Holdings, LLC ("TWC") and certain affiliates (together, "the Debtors"), which memorialized the Bankruptcy Court's April 2, 2019 bench ruling (B.D.I. 2282, 4/2/19 Hr'g Tr. at A3739-A3744) ("the Bench Ruling"). The appeal arises from the sale of substantially all of the Debtors' assets to appellee Spyglass Media Group, LLC ("Spyglass"). Prior to filing their bankruptcy cases, the Debtors received financing from the Appellants through "Investment Agreements," pursuant to which Appellants loaned money to the Debtors in exchange for, among other things, a security interest in the Debtors' rights in certain films. The Debtors agreed to repay these "financings" through revenues generated by the films based on a "waterfall" in the governing documents.

Following the sale, Appellants filed a Motion to Enforce seeking to (a) enforce the Bankruptcy Court's May 9, 2018 Order ("the Sale Order"), (b) confirm that Spyglass assumed the liabilities under the Investment Agreements through the asset sale, and (c) compel Spyglass to perform under the APA – *i.e.,* to repay the prepetition loans made to the Debtors under the Investment Agreements. (Appx. 43, B.D.I. 2110). The Order denied the Motion to Enforce for the reasons set forth in the Bench Ruling, including the Bankruptcy Court's determination that the Investment Agreements were non-executory contracts that are not capable of being assumed under section 365 of the Bankruptcy Code, and that the Investment Agreements were "Excluded

---

[1]     The docket of the Chapter 11 cases, captioned *In re the Weinstein Company Holdings*, Case No. 18-10601-MFW (Bankr. D. Del.) is cited herein as "B.D.I. __." The appendix (D.I. 12-16) filed in support of Appellants' opening brief (D.I. 11) is cited herein as "A__," and the appendix (D.I. 21-25) filed in support of the Appellees' brief (D.I. 20) is cited herein as "Appx. __."

Liabilities" under the APA that were not purchased by Spyglass. Appellants have appealed the Order. For the reasons set forth below, the Order is affirmed.

## I.     BACKGROUND

### A.     The Chapter 11 Cases and the APA

Debtors filed voluntary petitions under Chapter 11 on March 19, 2018 ("the Petition Date") in order to facilitate a sale of substantially all of their assets under section 363 of the Bankruptcy Code. The Debtors also filed a bid procedures and sale motion on the Petition Date, with Spyglass serving as the stalking horse bidder. On March 20, 2018, the Debtors filed a motion ("the Sale Motion") for approval of a sale of substantially all of the Debtors' assets to Spyglass, pursuant to terms negotiated prior to the Petition Date. Attached to the Sale Motion was an asset purchase agreement providing that Spyglass will acquire certain "Purchased Assets" in connection with the sale. Spyglass's offer remained the highest and best offer received by the Debtors for their assets even after the post-petition sale process. (Appx. 7, B.D.I. No. 846). The Bankruptcy Court approved the sale of substantially all of the Debtors' assets ("the Sale") to Spyglass in the Sale Order for $287 million pursuant to that certain *Asset Purchase Agreement by and Among The Weinstein Company Holdings LLC, the Persons Listed on Schedule 1 Hereto and Lantern Entertainment LLC*, dated as of March 19, 2018 (as subsequently amended, "the APA"). (Appx. 15, B.D.I. 1202). The sale closed on July 13, 2018 ("Closing Date"). (A2571-72).

### B.     The APA and the Contract Notices

Prior to the Closing Date, the Debtors and Spyglass entered into two amendments to the APA. (*See* Appx. 7, B.D.I. 846, *see also See* Appx. 14; B.D.I. 1187). The Debtors, Spyglass, and the Official Committee of Unsecured Creditors ("the Committee") extensively negotiated the second amendment ("the Second Amendment"). (*See* Appx. 19, B.D.I. 1232, at 21:7-24; 22:11-25; 23:1-12). A key deal point requested by the Committee in the Second Amendment was that

the outside date by which Spyglass would determine which executory contracts it desired to take assignment of would be 120 days from the effective date of the Second Amendment – November 8, 2019 ("the Assumption Outside Date").[2] (*See id.,* at 33:3-5; 40:23-25; *see also* Appx. 14, B.D.I. 1187, ¶ 2(a)).

The Debtors filed seven (7) notices of potential assumption and assignment of contracts, and on the Assumption Outside Date, Spyglass filed its eighth and final notice of potential assumption of contracts (each, a "Contract Notice" and, collectively, "the Contract Notices").[3] The Investment Agreements appeared on the May 10th Contract Notice ("the Assumed Contracts Schedule"), which identifies each contract that constitutes an "Assumed Contract" as defined in the APA. (A479- 2540). No amended Assumed Contracts Schedule was filed prior to the Closing Date. The May 10th Contract Notice contained the following standard disclaimer:

> [T]he presence of an Assumed Contract and Lease listed on Exhibit 1 attached hereto does not constitute an admission that such Assumed Contract and Lease is an executory contract or unexpired lease or that such Assumed Contract and Lease will be assumed and assigned as part of the Sale. The Debtors reserve all of their rights, claims and causes of action with respect to the Assumed Contracts and Leases listed on Exhibit 1 attached hereto.

---

[2]     Specifically, Section 2.8(i) of the APA provides:

Assumption Outside Date. Notwithstanding anything in this Agreement or the Sale Order to the Contrary, the Contract Designation Outside Date shall be the last date on which the Buyer may (x) designate a Disputed Contract as an "Excluded Asset" pursuant to Section 2.8(c) (with any such Disputed Contract not so designated assumed by Buyer as an "Assumed Contract" in accordance with the terms thereof), (y) assume a Contract that was not identified as an Assumed Contract as of the Closing pursuant to Section 2.8(f) (with any such Contract not so assumed constituting an "Excluded Contract" following such date) or (z) designate a Previously Omitted Contract as an "Assumed Contract" pursuant to Section 2.8(g) (with any such Previously Omitted Contract not so designated constituting an "Excluded Contract" following such date). For the avoidance of doubt, nothing in this Section 2.8(i) shall in any way affect any other date set forth in this Section 2.8, including the dates set forth in Section 2.8(a).

[3]     *See Appx.* 2, D.I. 216 (Apr. 13, 2018), 282 (Apr. 20, 2018), 482 (Apr. 27, 2018), 860 (May 10, 2018), 1003 (June 8, 2018), 1457 (Sept. 5, 2018), 1512 (Sept. 20, 2018), 1665 (Nov. 5, 2018), 1695 (Nov. 8, 2018).

(Appx. 8, B.D.I. 860 at 2). Each of the Contract Notices other than the November 8th Contract Notice (notably, the final Contract Notice), contained similar disclaimers. Appellants and Spyglass agree that the Investment Agreements were not executory[4] as of the Petition Date. (*See* D.I. 11 at 7; D.I. 19 at 6).

In the June 8th Contract Notice, the Debtors removed eight (8) of the Investment Agreements from the list. They claim these had only been previously listed out of an abundance of caution. (*See* Appx. 9; D.I. 1003, ¶7). The June 8th Contract Notice contained a conspicuous statement noting that certain previously listed contracts were being removed because the Debtors determined that such contacts were not executory, and therefore, incapable of assumption and assignment under section 365 of the Bankruptcy Code. (*See* Appx. 9; B.D.I. 1003, ¶¶ 5-6). The June 8th Contract Notice also contained the following statement designed to put contract counterparties on notice that, notwithstanding the fact that their contracts were not executory, Spyglass could elect to purchase the Debtors' rights under such non-executory contracts pursuant to section 363 of the Bankruptcy Code: "Notwithstanding that the contracts set forth on Exhibit A are not executory contracts and are not being assumed and assigned pursuant to Section 365 of the Bankruptcy Code, the Asset Purchase Agreement provides for the purchase, by [Purchaser], of any rights or assets transferred to the Debtors pursuant to such contracts." (*Id*. ¶ 7). This provision recognizes that, although an executory contract may be assigned to a buyer pursuant to section 365 of the Bankruptcy Code, a non-executory contract can be transferred to a buyer pursuant to section

---

[4] A contract is "executory" if "the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Enter. Energy Corp. v. United States ex rel. I.R.S. (In re Columbia Gas Sys. Inc.)*, 50 F.3d 233, 239 (3d Cir. 1995) (citation omitted). "Thus, unless both parties have unperformed obligations that would constitute a material breach if not performed, the contract is not executory under § 365." *In re Exide Techs*., 607 F.3d 957, 962 (3d Cir. 2010). "[T]he time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed." *Id*. (citation omitted).

363, and that the purchaser had reserved its rights to do so. (*See* A3183-84 (citing *DB Structured Prods. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc.)*, 402 B.R. 87, 98 (Bankr. D. Del. 2009) (debtor may transfer "rights and obligations under a non-executory contract pursuant to § 363 of the Bankruptcy Code")).

Spyglass removed nine (9) additional Investment Agreements from the November 8th Contract Notice and designated such Investment Agreements as "Excluded Contracts." The term "Excluded Contract" has the meaning given to it in the Sale Order, which in turn references the definition in the APA. The term "Excluded Contract" under the APA has the meaning set forth on Schedule 2.2 thereto. (*See* Appx. 15, D.I. 1202, at Sch. 2.2). Schedule 2.2(h) provides that all Contracts that are not Assumed Contracts are Excluded Contracts. (*Id.* at Sch. 2.2(h)). As of November 8th, only one Investment Agreement remained on the Contract Notices. Thus, according to Spyglass, as of the Assumption Outside Date, the Debtors or Spyglass had removed all but one of the Investment Agreements from the Contract Notices, meaning that the Investment Agreements were not slated for assumption and assignment and constituted "Excluded Liabilities" under § 2.4(f) of the APA.

### C. The Talent Party Litigation and Appeal

On January 14, 2019, the Bankruptcy Court conducted a hearing in connection with, among other things, arguments raised by certain work-for-hire parties, and in particular, Bruce Cohen, that their agreements with the Debtors (collectively "the Talent Party Agreements") were executory as of the Petition Date, and that therefore, Spyglass was required to cure all pre-closing defaults prior to taking assignment of such agreements ("the Talent Party Litigation"). Spyglass asserted in the Talent Party Litigation that the Talent Party Agreements were not executory and, therefore, could not be assumed and assigned to Spyglass, but that Spyglass had instead purchased the rights under the Talent Party Agreements under section 363 of the Bankruptcy Code and

designated such agreements as "Purchased Assets" under the APA. Although the Talent Party Agreements had been fully performed by the Talent Parties and were thus no longer executory, the Talent Party Agreements contained valuable and material intellectual property rights associated with certain films, referred to as "Covered Titles" under the APA, which Spyglass purchased in the Sale. Included among these intellectual property rights were copyrights in the Covered Titles, and also full ownership and exploitation rights[5] in the Covered Titles.

As Appellants point out, Spyglass had listed the Cohen Agreement, along with the Investment Agreements and other non-executory contracts, on the Assumed Contracts Schedule and the June 8th Statement. Spyglass commenced the litigation in order to seek clarification from the Bankruptcy Court as to whether Spyglass could acquire the Talent Party agreements without having to pay outstanding (pre-closing) cure amounts. (A743, A852; A2547; A2550-53). Spyglass argued that "[b]ecause the [Cohen] Agreement is not executory, there is no question that [Spyglass] acquired the rights held thereunder by The Weinstein Company as part of the sale." (A2927-28 ¶ 44). Spyglass further argued that "to the extent that a contract is deemed to be nonexecutory, [Spyglass] acquired all contractual rights owned by The Weinstein Company under that contract . . . 'to the fullest extent permitted by Section 363 of the Bankruptcy Code.'" (A2960-61 ¶ 30 (quoting APA § 7.5)).

At the conclusion of the hearing in the Talent Party Litigation, the Bankruptcy Court issued a bench ruling ("the TP Bench Ruling"). In the TP Bench Ruling, the Bankruptcy Court ruled that the Talent Party Agreements related to Bruce Cohen ("the Cohen Agreement") were not executory and that Spyglass had purchased the rights under Cohen Agreement under section 363 of the

---

[5]     *See, e.g.,* Appx. 34, D.I. 1939, Ex. A, Cohen Agreement, § 9 (providing that the Debtors possessed exclusive ownership of and rights in and to *Silver Linings Playbook*, including all copyrights, merchandising rights, and exploitation rights, and that the Cohen Agreement was a work-for-hire agreement, which did not confer any such rights on Cohen; Appx. 36, D.I. 1944 (sealed)).

Bankruptcy Code (*i.e.,* that the Cohen Agreement was a "Purchased Asset" under the APA), free and clear of all prior liens, claims, and encumbrances, but that Spyglass was obligated to perform under the Cohen Agreement post-Closing. (Appx. 41, B.D.I. 2005, at 133:8-25, 134-37). The TP Bench Ruling was implemented by Order dated January 23, 2019 (B.D.I. 2013) ("TP Order"). The Talent Parties and Cohen separately appealed the TP Order, which this Court affirmed on March 20, 2020. (*Cooper v. Lantern Entm't LLC*, Civ. No. 19-242-MN, D.I. 39, 40; *Bruce Cohen Productions v. Lantern Entm't LLC*, Civ. No. 19-243-MN, D.I. 39, 40).

### D. The Yucaipa Litigation

Prior to the Petition Date, certain of the Debtors were party to Investment Agreements relating to a number of the Debtors' film projects.[6] The Investment Agreements are largely identical contracts by which each Appellant, as "Financier," agreed to contribute a certain amount of money to facilitate the production of various films by TWC or its affiliate, in exchange for a portion of the gross receipts earned by TWC upon exploitation of such films.[7] TWC retained creative control over "all matters relating to the distribution of the Picture." (*See* Appx. 45, B.D.I. 2112, Ex. H-1, ¶ 3).

On February 20, 2019, just over one month after the Bankruptcy Court issued the TP Bench Ruling, Appellants filed their Motion to Enforce, seeking to (a) enforce the Sale Order, (b) confirm that Spyglass assumed the liabilities under the Investment Agreements through the Sale, and (c) compel Spyglass to perform under the APA – *i.e.,* to repay the prepetition loans made to the

---

[6]     The Investment Agreements pertain to the following films: *The Upside; August Osage County; Crouching Tiger Hidden Dragon; Lawless; Mandela – Long Walk to Freedom; Our Idiot Brother; Philomena; Quartet; The Details; The Giver; The Iron Lady; and The Sapphires* ("the Films").

[7]     Although the Investment Agreements are largely identical, not all terms are contained in each agreement. (*See* Appx. 47, B.D.I. 2202, at Ex. A (a chart identifying the applicable debt characteristics of each Investment Agreement)).

Debtors under the Investment Agreements. (Appx. 43, B.D.I. 2110). Appellants argued that although the Investment Agreements were not executory, they constituted Purchased Assets under the APA. Appellants argued that nothing in the APA permitted the purchaser to amend or re-designate nonexecutory contracts that were listed on the Assumed Contracts Schedule as Excluded Contracts (and therefore Excluded Assets under Section 2.2 of the APA) *after* the Closing Date. Appellants further argued that pursuant to the sale, Spyglass acquired all "Title Rights." This term is defined broadly to include all "Assumed Contracts *and all other contract rights*" with respect to each "Covered Title," and Appellants argued that the definition of "Covered Titles" includes each film subject to the each of the Investment Agreements. (*Id.* at Appx. 6423). "Thus, in addition to being Purchased Assets by virtue of being included on the Assumed Contracts Schedule as Assumed Contracts, the Investment Agreements also constitute Purchased Assets because they fall within the definition of Title Rights under APA Schedule 2.1(b)." (*Id.*).

On April 2, 2019, the Bankruptcy Court heard arguments and testimony in connection with Appellants' Motion to Enforce. Appellants' witness, Mr. Bermingham, who negotiated and signed the Investment Agreements (B.D.I. 2282, 4/2/19 Hr'g Tr. at 29:18-20), testified that the agreements were to provide funding for the Films and that the Debtors, in at least one instance, guaranteed such debt obligations (*id*. at 29:18-20). Mr. Bermingham testified that Yucaipa served as the "Financier" under the Investment Agreements, that Yucaipa neither received nor retained an ownership interest in the Films, had no involvement in any creative aspects of the production of the Films, had no right of authorship, and had no intellectual property rights. (*Id*. at 32:2-16). He further testified that the Investment Agreements were treated as investments in the profits of the Films; that Yucaipa's return under the Investment Agreements would come in the form of "gross proceeds, potential gross proceeds, of the [Films] pursuant to the distribution waterfalls in each [Investment] [A]greement"; and that these returns were contingent upon the Films performing

well. (*Id*. at 36:21-25, 37:1-7). Mr. Bermingham testified that Yucaipa was participating as a lender with respect to the Films and negotiating "intercreditor" agreements and similar documents with TWC's bank. (*Id*. at 36:21-25, 37:1-7). He further acknowledged that Yucaipa had a right to be repaid on its debt only if the Films generated gross receipts. (*Id.* at 37:12-24).

At the conclusion of that hearing, the Bankruptcy Court issued the Bench Ruling denying Appellants' Motion to Enforce. The Bankruptcy Court held that the entirety of Section 2.8 of the APA, including the Second Amendment to the APA, clarified that Section 2.8 applies only to executory contracts. (A3740, 4/2/19 Hr'g Tr at 58:10-17). Rejecting Appellants' argument that the Investment Agreements were purchased assets pursuant to Section 2.8 of the APA because they were on the list of "Available Contracts" and Spyglass never took them off the list, the Bankruptcy Court noted that "the express language of 2.8 relates to executory contracts" and "Available [C]ontracts are defined as all executory contracts relating to the business or the purchased assets." (*Id*. at 57:19-58:2). The Bankruptcy Court noted that the inclusion of non-executory contracts on the list was "to be sure that all possibly executory contracts were included on the list from which the buyer would designate contacts . . . to be assumed by it." (*Id.* at 58:3-9). Having determined that the Investment Agreements were not executory contracts capable of assumption under section 365, and thus were not Assumed Contracts that would fall under the category of Purchased Assets, the Bankruptcy Court noted that the "only possible argument" was whether or not rights under the Investment Agreements were Purchased Assets pursuant to section 363. (*Id*. at 58:25-59:6).

The Bankruptcy Court determined that, despite the broad description of assets being sold, as set forth in section 2.1 of the APA,[8] "there were really no rights related to the ongoing business

---

[8]      Pursuant to Section 2.1 of the APA, Spyglass acquired "all of the Seller Parties' right, title and interest of any kind or nature in and to the Title Rights and the Covered Titles (whether tangible or intangible) . . . ." (A452-53 Schedule 2.1(b)).

that existed under the investment agreements once the invested funds were paid." (*Id*. at 59:7-17). "The only significant thing left was the obligation to repay out of future gross revenues" which did not constitute a "right," but rather a "liability or obligation" of the Debtors. (*Id.* at 59:17-20). The Bankruptcy Court further determined that the rights remaining under the Investment Agreements on the Petition Date did not relate directly to Covered Titles and did not qualify as "Title Rights." (*Id.* at 60:6-12). Finally, the Bankruptcy Court determined that the Talent Party Agreements were distinguishable from the Investment Agreements, as the former represented assets for purchase, but the latter represented liabilities of the Debtors. (*See id*. at 60:13-25). On April 4, 2019, the Bankruptcy Court entered the Order memorializing the Bench Ruling and denying the Motion to Enforce. (B.D.I. 2269).

### E. The Appeal

On April 11, 2019, Appellants timely appealed the Order. (D.I. 1). The appeal is fully briefed. (D.I. 11, 19, 29). The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. The issues on appeal are (1) whether the Bankruptcy Court correctly concluded that the Investment Agreements were not capable of assumption and, therefore, were not Purchased Assets under the APA, (2) whether the Bankruptcy Court properly ruled that the Investment Agreements were Liabilities and not Purchased Assets under the APA, and (3) whether the Bankruptcy Court correctly held that the Talent Party Agreements are distinct from the Investment Agreements.

## II. <u>JURISDICTION AND STANDARDS OF REVIEW</u>

The Court has jurisdiction to hear an appeal from a final judgment of the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1). This Court "review[s] the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse

thereof." *Manus Corp. v. NRG Energy, Inc.* (*In re O'Brien Envt'l Energy, Inc.*), 188 F.3d 116, 122 (3d Cir. 1999). When interpreting the legal effect of a contract, this Court reviews the lower court's legal determinations *de novo*. *See Viera v. Life Ins. Co. of North America*, 642 F.3d 407, 413 (3d Cir. 2011) ("We also review the legal interpretation of contractual language *de novo*."); *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1254 (3d Cir. 1993). As the APA and related documents are unambiguous, *de novo* is the appropriate standard of review by this Court. *See, e.g.*, *Skold v. Galderma Labs. L.P.*, 917 F.3d 186, 191 n.9 (3d Cir. 2019) ("[W]e review the interpretation of an unambiguous contract de novo.").

## III.  DISCUSSION

The Court finds no error in the Bankruptcy Court's determination that the Investment Agreements are not Purchased Assets under the plain language of the APA.

### A.  The Investment Agreements Are Not "Assumed Contracts" or "Title Rights" Under the APA

Appellants argue that the Investment Agreements constitute Purchased Assets under the APA because they are Assumed Contracts. (D.I. 11 at 26-37). The APA defines "Purchased Assets" as all "rights, Claims and assets (other than Excluded Assets) of every kind and description" of the Debtors, including the assets listed on Schedule 2.1 to the APA. (A309-10 § 2.1; A452-53 Sch. 2.1). Schedule 2.1(e) of the APA provides that all "Assumed Contracts" are Purchased Assets. (A452). The Assumed Contracts are described as those contracts designated by Spyglass "prior to the Closing Date" that Spyglass "wishes to 'assume.'" (A313-14 § 2.8(a)). Spyglass selected the contracts from "Section 2.8(a) of the Disclosure Schedule," which is a contracts schedule that the Debtors prepared in connection with the APA. (*Id.*). Section 2.8(a) of the Disclosure Schedule included both "executory" and "non-executory" contracts. The Debtors and Spyglass listed each Investment Agreement on the Assumed Contracts Schedule (defined below) filed prior to the Closing Date. (A1849-50; A2520-22, 2528).

On July 11, 2018, prior to the Closing Date, the Bankruptcy Court entered an order approving the Second Amendment, which specified that Spyglass would be permitted to remove *executory* contracts from the Assumed Contracts Schedule as Purchased Assets after the Closing Date. Appellants argue that, based on the addition of the word "executory," however, the Second Amendment did not alter the requirement that Spyglass must remove ***non-executory*** contracts prior to the Closing Date. (A2254-70). Specifically, the Second Amendment made one primary revision to Section 2.8(a) of the APA, inserting the word "executory" into Section 2.8(a) and in Schedule 2.2(h):

> (e) The fourth sentence of Section 2.8(a) of the [APA] is hereby amended and restated as follows:
>
> > "All **executory** Contracts of the Seller Parties that are listed on Section 2.8(a) of the Disclosure Schedule as of the Closing Date and which Buyer does not designate in writing for assumption shall not be considered Assumed Contracts or Purchased Assets and shall automatically be deemed "Excluded Contracts" (and for the avoidance of doubt, [Spyglass] shall not be responsible for any related Cure Amounts related to any Excluded Contracts)."
> > . . .
> > (r) Clause (h) of Schedule 2.2 of the [APA] is hereby amended and restated in its entirety as follows: "all **executory** Contracts that are not Assumed Contracts including (i) all Employment Contracts and all other employment, severance or similar Contracts with employee or service provider of the Seller Parties and (ii) all Contracts set forth in Schedule 2.2(h) (collectively, the "Excluded Contracts")."

(A2559 & A2564 ¶ 2(e) & (r) (emphasis added)). The Debtors and Spyglass subsequently removed all but one of the Investment Agreements from the Contract Notices. (D.I. 19 at 7-8).

Appellants argue on appeal that the addition of the word executory in the Second Amendment changed and limited the types of contracts that could be deemed Excluded Contracts post-closing such that only *executory* contracts could be deemed Excluded Contracts after the Closing Date. According to Appellants, there is no provision in the APA that allows Spyglass to designate a nonexecutory Assumed Contract as an Excluded Contract after the Closing Date.

Appellants contend that the Assumed Contracts Schedule was essentially "fixed" for nonexecutory contracts as of the Closing Date (other than Disputed Contracts),[9] and that only executory contracts and Disputed Contracts could be removed from the Assumed Contracts Schedule post-closing.[10] As all of the Investment Agreements listed on the post-Closing Date notices are non-executory contracts, and because Spyglass lacked the power to remove any non-executory contracts from the Assumed Contracts Schedule after the Closing Date, Appellants argue that they now constitute Assumed Contracts; the listing of any Investment Agreements on any post-Closing notice, according to Appellants, "constituted a null and void unauthorized attempt to circumvent the terms of the APA." (D.I. 11 at 17).

The Bankruptcy Court rejected this reading of the APA. And so does this Court. The Appellants' argument fails for several reasons, including that the Investment Agreements are not executory and cannot be assumed under section 365(a) of the Bankruptcy Code as a matter of law. Even if Spyglass wanted to assume the Investment Agreements under the Sale, it could not as a matter of law, notwithstanding the appearance of any Investment Agreement on any Contract Notice. *See In re Exide Techs.,* 378 B.R. at 766-67 ("[T]he Joint Plan language cannot 'deem' a non-executory contract to be an executory contract so that the Debtor can assume it."); *In re Fitch,*

---

[9]     The Second Amendment also provides that until November 8, 2018, Spyglass could designate a "Disputed Contract" (as defined in the APA) as an Excluded Asset (as defined in the APA), pursuant to Section 2.8(c) of the APA. (A2559-60 ¶ 2(f)). Under the APA, however, a Disputed Contract refers only to a contract where the counterparty has filed an "***objection . . . to the Cure Amount . . . .***" A314 § 2.8(c) (emphasis added). The Investment Counterparties did not file any objections regarding the proposed Cure Amounts of the Investment Agreements. Therefore, the Investment Agreements do not constitute Disputed Contracts or Excluded Assets.

[10]     *Compare* A313-15 § 2.8 (requiring Spyglass to designate Assumed Contracts prior to the Closing Date), *with* A2559-A2561 ¶ 2(e) & (f) (allowing only post-closing removal of executory contracts and Disputed Contracts).

174 B.R. 96, 101 (Bankr. S.D. Ill. 1994) ("A debtor cannot change the nature of a contract merely by electing to assume it under [section] 365.").

First, the Assumption Outside Date was established through the Second Amendment to the APA. (*See* Appx. 14, D.I. 1187, at § 2(e); Appx. 15, D.I. 1202, at § 2.8(a)). The Assumption Outside Date – the final date by which Spyglass could designate executory contracts for assumption and assignment – was heavily negotiated by the Debtors, Spyglass, and the Committee. (Appx. 19, D.I. 1232, at 21:7-24; 22:11-25; 23:1-12; Appx. 15, D.I. 1202, at § 2.8(i)). The negotiated Assumption Outside Date contradicts Appellants' argument that Spyglass automatically assumed the Investment Agreements because Spyglass was required to notify parties of its decision whether to assume or assign an executory contract prior to the July 13, 2018 Closing.

Second, Appellants' argument hinges upon the fact that its admittedly non-executory Investment Agreements were included on the June 8th Contract List. "Therefore," because all "Assumed Contracts" are Purchased Assets, "each Investment Agreement was explicitly identified as a Purchased Asset" on the June 8th Contract List. (Appx. 43, B.D.I. 2110, ¶ 8). This argument fails, however, because Assumed Contracts must be executory under the plain terms of the APA. Section 2.8(a) of the APA, entitled "Available Contracts," defines "Available Contracts" as the "list [set forth on section 2.8(a) of the Disclosure Schedules to the APA] of all *executory* Contracts relating to the Business or the Purchased Assets to which one or more of Seller Parties are party" (emphasis added). The same section specifies that "Buyer . . . shall designate in writing *which Available Contracts from Section 2.8(a) of the Disclosure Schedule* . . . that Buyer wishes to 'assume' (the 'Assumed Contracts')." (Appx. 15, B.D.I. 1202, at § 2.8(a) (emphasis added)). It is apparent from the APA that, in order for an agreement to be an Available Contract, and therefore an Assumed Contract, it must be executory.

Appellants admit that each of the Investment Agreements was non-executory as of the Petition Date,[11] which occurred almost two months before the Sale was approved by the Bankruptcy Court and four months before the Sale closed. Under section 365 of the Bankruptcy Code, a debtor is permitted only to assume executory contracts and unexpired leases.[12] Because the Investment Agreements were not executory as of the Petition Date, they were not "available" to serve as Available Contracts subject to assumption and assignment as Assumed Contracts under the APA.

Appellants further argue that the Investment Agreements were assumed under Section 2.8 of the APA, as contracts that relate to the Business or the Purchased Assets. The term "Business" is defined in the APA to mean "the business of developing, producing, distributing and otherwise Exploiting motion pictures, television programs and other audio visual content as currently conducted by the Seller Parties." (*See* Appx. 15, D.I. 1202, at Ex. A-2). The term "Exploit" means:

> [W]ith respect to a Covered Title, the exhibition, distribution, reproduction, development, subdistribution, transmission, display, broadcast, performance, dissemination, publication, production, co-production, promotion, publicizing, advertising, reproduction, rental, leasing, subleasing, selling, licensing, sublicensing, transfer, disposal of, commercializing, marketing, usage, trading in, turning to account, dealing with and in and otherwise exploiting such Covered Title by any means, methods, processes, media devices and delivery systems of every kind or character, whether now known or hereafter created, including, without limitation, the right to exercise the ancillary rights relating thereto and to produce and develop such Covered Titles (including derivative rights therein), to the extent included in the Title Rights. The meaning of the term "Exploitation" shall be correlative to the foregoing.

---

[11]   *See* Appx. 43, D.I. 2110, ¶ 3 ("[Yucaipa] fully satisfied [its] obligations under the Investment Agreements prior to the Petition Date, thereby rendering the Investment Agreements non-executory when these Chapter 11 Cases . . . commenced.").

[12]   11 U.S.C. § 365(a) ("[T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."); *In re Exide Techs.*, 378 B.R. 762, 765 (Bankr. D. Del. 2007) ("Section 365 allows debtors to assume or reject an executory contract, but provides no such option for a non-executory contract.").

(Appx. 15, D.I. 1202, at Ex. A-6).  As Mr. Bermingham testified, Appellants had no involvement in any creative aspects of the production of the Films, and instead were participating as a lender – a lender whose right to repayment was contingent upon the Films generating gross receipts.  In sum, Mr. Bermingham's testimony confirms that the Investment Agreements were non-recourse debt instruments and were not related to the operation of the Business or the Exploitation of the Films.  Section 2.4 of the APA sets forth a non-exclusive list of "Excluded Liabilities," which includes "any indebtedness for borrowed money, bank loans or facilities or any other debt instruments."  (*See* Appx., 15, B.D.I. 1202, at § 2.4(c)).  Moreover, section 2.4(f) of the APA provides that "all Liabilities arising under any Contract that is not an Assumed Contract" is an "Excluded Liability."  (*Id.*, at § 2.4(f)).

Appellants next argue that the inclusion of the disclaimer in the June 8th Contract Notice (Appx. 9, B.D.I. 1003, ¶ 7), which was designed to put counterparties on notice that non-executory contracts may be purchased under the APA, constitutes an admission that the Investment Agreements were slated for purchase by Spyglass under the APA.  The Court disagrees.  It is not reasonable to conclude that Spyglass impliedly assumed millions of dollars of debt obligations with no corresponding benefit based on a disclaimer the Debtors included in the June 8th Notice.  Moreover, the Debtors later removed the Investment Agreements, which means that under the APA, they were no longer to be included as items to be purchased.  Thus, although Appellants' logic is flawed, even if followed, it should be followed to its conclusion, which would require acknowledging that the removal of the Investment Agreements from the list of Assumed Contracts prior to the Assumption Outside Date turned them back into Excluded Assets.

Finally, the Investment Agreements are not "Title Rights" under the APA.  Appellants argue that the Investment Agreements are "Title Rights" because the definition of Title Rights includes "the Assumed Contracts ***and all other contract rights*** with respect to each Covered Title"

under the APA. (*See Appx.* 15, D.I. 1202, at Ex. A-13) (emphasis added). Appellants argue that the Bankruptcy Court's determination that the "definition of [T]itle [R]ights . . . is [not] broad enough to include rights under [the Investment Agreements]" was based on its improper determination that "there are no rights left under these contracts." (A3742, 4/2/19 Hr'g. Tr. at 60:6-12). Appellants rely on the indemnification and confidentiality rights contained in the Investment Agreements, which the Bankruptcy Court properly determined were not "expressly related to the titles that were bought by Spyglass." (*Id.* at 60:6-12). According to Appellants, the Bankruptcy Court improperly ignored that Debtors were "entitled to receive guidance and input" from the Investment Counterparties with respect to "production, distribution and marketing" of the Investment Movies under the Investment Agreements. (*See* D.I. 11 at 40 (citing A3489 ¶ 3, A3496 ¶ 3, A3510 ¶ 3; *see also* A3517 ¶ 3, A3531 ¶ 3, A3544 ¶ 3, A3550 ¶ 3, A3570 ¶ 3, A3577 ¶ 3, A3583 ¶ 4, A3600 ¶ 3, A3614 ¶ 3)). Appellants assert that these rights "plainly relate to the Investment Movies (*i.e.*, Covered Titles) and, therefore, constitute Title Rights." (*Id.*)

The Court again disagrees. Appellants have no interest in the Covered Titles beyond the initial, prepetition financial investment. The Debtors' right to receive input from their investors does not lead the Court to conclude that the Investment Agreements are "contract rights" purchased by Spyglass. Only obligations remain under the Investment Agreements, and the Debtors' obligations to pay Appellants are Excluded Liabilities for which Spyglass is not responsible.[13]

_____

[13]    Spyglass argues that, even if the Investment Agreements were executory, they are not capable of assumption and assignment under section 365(c)(2) of the Bankruptcy Code, which prohibits a debtor from assuming and assigning an executory contract "if such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor." (D.I. 19 at 22). Thus, "there is no way that a debtor can assume [a financing] agreement." (*Id.* (quoting *Watts v. Pa. Housing Fin. Co.* (*In re Watts*), 876 F.2d 1090, 1095 (3d Cir. 1989)). Appellants contend that this argument is a red herring, and the Court agrees. (D.I. 28 at 4-5). Because the parties and the Court agree that the Investment Agreements were not executory, the Court need not address Spyglass's argument that the Investment

**B.      Obligations Under the Investment Agreements Are "Excluded Liabilities"
Which Spyglass Did Not Assume**

The Court finds no error in the Bankruptcy Court's ruling that the Investment Agreements

are "Excluded Liabilities" under the APA based on the plain language of the APA.

Appellants argue that Spyglass assumed all post-closing liabilities arising out of every

Assumed Contract, including the Investment Agreements, under section 2.3 of the APA, entitled

"Assumption of Liabilities."  That section provides, in relevant part, that "Buyer shall (a) assume

from the Seller Parties and thereafter pay, perform or discharge when due those Liabilities of the

Seller Parties arising out of the operation of the Purchased Assets (including the Assumed

Contracts) for periods following the Closing Date, except for those Liabilities that are Excluded

Liabilities."  (*See* Appx. 15, D.I. 1202, at § 2.3).  The Investment Agreements are "Excluded

Liabilities" under the APA, however, because they contain liabilities arising under a contract that

is not an Assumed Contract.  The APA states that Spyglass "is assuming only the Assumed

Liabilities and is not assuming any other Liability of any Seller Party of whatever nature, whether

presently in existence or arising hereafter.  All such other Liabilities shall be retained by and

remain Liabilities of the Seller Parties (all such Liabilities not being assumed being herein referred

to as the 'Excluded Liabilities') . . . ."  (*See* Appx. 15, B.D.I. 1202, at § 2.4).

---

Agreements were not capable of assumption and assignment for the additional reason that
they fall within section 365(c)(2)'s prohibition.

Section 2.4(f) of the APA contains a list of Excluded Liabilities, including "all Liabilities[14] arising under [a] Contract[15] that is not an Assumed Contract." Because the Court agrees that the Investment Agreements are not Assumed Contracts, any obligations arising thereunder also were not assumed by Spyglass under the APA. (*Id*. at § 2.4(f). Schedule 2.3 of the APA lists "Assumed Liabilities," which consist of "non-recourse project level debt relating to the following Covered Titles and represented by the credit facilities described below, the outstanding balances as of February 28, 2018 of which are set forth on Appendix I to this Schedule 2.3." (*See* Appx. 15, D.I. 1202, at Schedule 2.3). Notably, the non-recourse debt instruments entered into between the Debtors and Appellants (*i.e.*, the Investment Agreements) are *not* listed on Schedule 2.3 of the APA. *See id.* If the Investment Agreements were intended to be Assumed Liabilities, they would have been included in this section of the APA.

Second, the Investment Agreements are "Excluded Liabilities" under the APA because they are debt instruments. It is clear that at the time of the sale, the agreements were the Debtors' liabilities to repay a loan. Section 2.4(c) of the APA lists as Excluded Liabilities "any indebtedness for borrowed money, bank loans or facilities or any other debt instruments." Based on a plain reading of the Investment Agreements, and as Appellants' witness confirmed in his testimony, the Investment Agreements are loan agreements between Yucaipa, as Financier, and TWC, as borrower. Appellants did not receive any underlying rights in the intellectual property that is being exploited, nor did they receive or retain any ownership interest in the Films, or have any right to

---

[14]    "Liabilities" is defined as "all claims, demands, expenses, commitments and obligations (whether accrued or not, known or unknown, disclosed or undisclosed, matured or unmatured, fixed or contingent, asserted or unasserted, liquidated or unliquidated, arising prior to, at or after the commencement of any bankruptcy proceeding) of or against the Seller Parties or any of the Purchased Assets." (*See* Appx. 15, D.I. 1202, at Ex. A-8).

[15]    "Contract" is defined as "any written contract, lease, license, agreement, arrangement, understanding, commitment, instrument, guarantee, undertaking, bid or proposal." (*See* Appx. 15, D.I. 1202, at Ex. A-4).

provide creative input with respect to the Films. In sum, the Investment Agreements were Liabilities under the APA.

The Investment Agreements are not Assumed Liabilities as they were not listed on Schedule 2.3 of the APA. Schedule 2.3 sets forth specific non-recourse project level debt related to certain films and projects. The Investment Agreements are not on that list. Through the Second Amendment, Spyglass agreed to assume post-Closing Liabilities of the Debtors "arising out of the operation of the Purchased Assets (including the Assumed Contracts) for periods following the Closing Date, except for those Liabilities that are Excluded Liabilities. . . ." (Appx. 14, D.I. 1187, § 2(a)). The Investment Agreements did not arise out of the operation of the Purchased Assets – the Business of Exploitation of motion pictures and other similar projects. The Talent Party Agreements contained exclusive copyrights and exploitation rights; as such, Spyglass's purchase of the rights in those non-executory contracts, as Purchased Assets, included Spyglass's agreement to pay corresponding post-Closing obligations. Unlike the Talent Party Agreement, the Investment Agreements are debt instruments of the Debtors' liabilities and can provide no value to a purchaser.

The assumption of liabilities under an asset purchase agreement is factored into the purchase price and the overall benefit of the bargain being negotiated between the buyer and seller; in the same vein, the exclusion of liabilities is clearly set forth in an asset purchase agreement. Here, section 2.4(c) of the APA specifically and expressly listed debt instruments and financial accommodations like the Investment Agreements as Excluded Liabilities. The Court agrees that Appellants cannot argue that Spyglass assumed its Liabilities through the sale by cobbling together a series of defined terms in the APA or by relying on Contract Notices that contained numerous disclaimers contrary to Appellants' position. Under the circumstances, the Bankruptcy Court was correct in ruling that Spyglass did not impliedly assume those liabilities. For Spyglass to have assumed them, the APA would have to have been clear and unequivocal on this point.

## C. The Bankruptcy Court Did Not Err in Determining that the Talent Party Agreements Are Distinguishable From the Investment Agreements

According to Appellants, Spyglass recently agreed, and the Bankruptcy Court ordered, that Spyglass was obligated for the post-closing obligations of the Cohen Agreement, a similarly non-executory contract which, like the Investment Agreements were (a) designated for inclusion on the Assumed Contract Schedule, and (b) not removed from the Assumed Contracts Schedule prior to the Closing Date. (*Id.*; D.I. 29 at 1-2). The Bankruptcy Court determined that the Investment Agreements must be treated differently than the Cohen Agreement "not simply because the buyer designated the Cohen contracts as ones that the buyer bought under 363, but because the rights remaining under the Cohen contracts and the other talent contracts were rights that were significant, rights in the intellectual property related to the covered titles." (A3742, 4/2/19 Hr'g Tr. at 60:13-25). Appellants argue the decision is erroneous because the Bankruptcy Court determined that the Cohen Agreement was a Purchased Asset under similar facts. (D.I. 11 at 18). The Court disagrees.

In the Cohen Litigation, Spyglass argued that "to the extent that a contract is deemed to be nonexecutory, [Spyglass] acquired all contractual rights owned by The Weinstein Company under that contract . . . 'to the fullest extent permitted by Section 363 of the Bankruptcy Code.'" Although Cohen argued that the Cohen Agreement *was* executory because it was included in the Assumed Contracts Schedule, Spyglass argued, as it does here, that the Assumed Contracts Schedule expressly states that the inclusion of any agreement "does not constitute an admission that such Assumed Contract and Lease is an executory contract . . ." (A480; A3074). Agreeing with Spyglass, the Bankruptcy Court held that the Cohen Agreement "was not executory as of [the Petition Date] . . ." (A3188 ¶ 1), but that rights under the nonexecutory contracts were transferred to Spyglass pursuant to section 363. As the Bankruptcy Court recognized, "the concept of a sale free and clear of all liens, claims and interests does not mean that you can sell the benefits of a

contract, but not its ongoing obligations." (A3184). "[T]he difference between 365 and 363 transfers is simply that a sale under 363 does not obligate the buyer to cure prior . . . payment defaults that the debtor would have to, otherwise, be obligated to make. But . . . it's bound by the terms of the agreement going forward on an[d] after closing." *Id*. Accordingly, the Bankruptcy Court determined that Spyglass "purchased the rights to the [Cohen Agreement] pursuant to Section 363 of the Bankruptcy Code" and ***must "comply with all post-closing obligations arising thereunder, including, but not limited to its payment obligations***." (A3188 ¶ 1 (emphasis added)). Citing this language, Appellants argue that the Bench Ruling denying its Motion to Enforce Spyglass's post-closing obligations is erroneous.

The June 8th Notice clearly indicated to contract counterparties that, notwithstanding the fact that certain of their contracts were not executory, Spyglass may elect to purchase ***rights or assets*** in those contracts pursuant to § 363 of the Bankruptcy Code"[16] as it did with respect to the Talent Party Agreements. The Investment Agreements here contained no such rights, and the Court rejects Appellants' attempts to recharacterize the Investment Agreements as anything other than Liabilities under the APA. At bottom, Appellants argue that remaining confidentiality and indemnification rights contained in the Investment Agreements were among the "Purchased Assets" transferred to Spyglass pursuant to § 363, and that, having received those rights in the sale, Spyglass must be held to the Debtors' debt obligations – totaling millions of dollars. (D.I. 11 at 39-40). According to Appellants, "there is nothing in the definition of 'Contract' or 'Assumed Contract' that requires 'significant, rights in the intellectual property related to the covered titles.'" (*Id*. at 34-35).

---

[16]     *See* Appx. 9; B.D.I. 1003, ¶ 7 ("Notwithstanding that the contracts set forth on Exhibit A are not executory contracts and are not being assumed and assigned pursuant to Section 365 of the Bankruptcy Code, the Asset Purchase Agreement provides for the purchase, by Lantern, of any ***rights or assets*** transferred to the Debtors pursuant to such contracts.") (emphasis added).

The Bankruptcy Court properly distinguished such rights from the valuable rights contained in the TP Agreements, the purchase of which required compliance with post-closing obligations. The Bankruptcy Court correctly found that Talent Party Agreements are work-for-hire agreements, which conveyed significant and important rights to the Debtors, including intellectual property rights, ownership rights, and exploitation rights. (Appx. 34, B.D.I. 1939, Ex. A, Cohen Agreement, § 9). The Investment Agreements, on the other hand, are liabilities of the Debtors that had no cognizable value for purchase by Spyglass. Spyglass had no reason to purchase these debt obligations because, unlike the work-for-hire Talent Party Agreements, the Investment Agreements do not add value; Appellants had already provided the funds to the Debtors, and all that remains is a payment obligation of the Debtor counterparty. Indeed, such liabilities were specifically listed as Excluded Liabilities and were not listed as Assumed Liabilities. Thus, the Bankruptcy Court correctly concluded that the Talent Party Agreements are distinguishable from the Investment Agreements because the Talent Party Agreements have value, whereas the Investment Agreements are Liabilities.

IV.     **CONCLUSION**

The Bankruptcy Court correctly held that the Investment Agreements are not Purchased Assets under the APA. A separate Order shall be entered.